Good morning. Good morning. Tom Schlesinger for Daniel Leroy Pick requesting three minutes in rebuttal. Uh, this case deals with the search of an envelope that was not legally permissible when the officers approached Mr Pick and his partner on the 1100 block of Venice Boulevard. Uh, there might have been reasonable suspicion that, uh, they could have been armed because of the 911 call justifying the pat down, the request for the pat down. But the request for the pat down was only to establish whether they had weapons. And once it was determined that Mr Pick did not have a weapon, uh, there was really no reason to continue the investigation. But the government's argument is that it was a search incident to arrest. And, um, obviously they could do a pat down and also look for evidence. If there's any evidence that might be destroyed. So based on that theory, according to the government, they pulled out the envelopes, continued the search, and he noticed that the envelope wasn't made out to him. So why doesn't that get past the reasonable suspicion that we have probable causes search incident to arrest? Well, that's the whole crux of this case is whether you, uh, believe that there was probable cause to arrest for either trespass or loitering. Explain why they didn't. The California laws are written extremely broadly on trespass and loitering. Basically, if you seem to be hanging out for no good reason, that's that's well, why wasn't? Why didn't they have probable cause? Well, first of all, they didn't have probable cause to arrest for trespass because there was really no evidence of any intent to interfere with property rights. How about loitering? Loitering is really the question here. Were they loitering? Um, if you look at the Edgerly decision that we cited in the brief, I think that's the that's the case that really controls the decision in this case. Edgerly. Edgerly, the case involving the gentleman who was standing in the cooperative in San Francisco. And in that case, the San Francisco Police Department, uh, saw him inside the curtilage. Uh, he was in the playground area. There were no trespassing signs, and there was also a fence that surrounded the property. They also knew, unlike in this case, they knew that dealing in narcotics in that neighborhood. And yet, uh, the panel in that case said it wasn't enough for loitering, even though the black and white saw him initially, then went around the corner about five minutes later, came back. He was still standing in the same area. So the government says there's other factors in this case. So they had a 911 call that they were burglaries in the area, and they asked for the cell phone, which was suspicious because that's a prelude to robbery. So it wasn't just that they were chilling. I think that's what the person in Edgerly said. Well, uh, in terms of the justification for conducting the pat down search, I see your point because of the time of the time of the day and the report concerning a request to use the phone, which in itself is not a criminal act. But, uh, the, the caller was concerned because, uh, the caller, uh, had, uh, noted that there had been burglaries in the area, but, uh, the police report and the declarations of the officers indicate that they, uh, were not at that point convinced that they had probable cause to arrest, uh, for investigation. But their own thoughts are not significant here, right? It's the objectively whether there was enough for probable cause. But objectively speaking, the reason why that Edgerly decision is so important in this case is because there's no evidence in the case that either Mr Picker, his partner, were quote unquote delaying or lingering within the that they didn't live there. It was 10 o'clock, um, at night, and they had there's reasonable grounds to believe that they had just, uh, asked these passers by for their cell phone and what had been in that area, a prelude to burglary, and it caused alarm enough for this 911 call. So, uh, given that they knew that they didn't live there, why isn't that reasonable grounds to believe, um, that there's enough on their intent as to why they're there to justify an arrest given what they did with the passer by and the 911 call? Why doesn't that get past the relatively modest probable cause burden? I think that what they had there at most was a strong suspicion. I don't think that they had a fair probability. Well, they were deceptive, too, when they were questioned about why they were there. If there were no nefarious purpose, why wouldn't, why would they, um, prevaricate about why they were there? Well, it was Mr. Ortega who was the, uh, the, uh, the other person who had a outstanding warrant who, uh, was, uh, now, uh, uh, being approached by the police officers and for whatever reason, uh, made the statements, uh, these inconsistent statements as to why, uh, as to whether he lived there or not. But Mr. Pick didn't say anything. And Edgerly, was Edgerly a loitering case? Edgerly was, uh, yeah. Well, Edgerly was, uh, yes, it was, uh, it was, uh, it was, uh, any number of, uh, these petty offenses were, were under consideration, including any number of the whole litany of different trespass offenses. In Edgerly? Yeah. Oh, well, in, uh, there, in that case, uh, they, they indicate... Point me to the language in the case that talks about loitering. Except this is your best case. All right. Well... So point me to the language in Edgerly that talks about loitering. Right. In that opinion, it said that, uh, long before the defendant's arrest, the What page are you on? Oh, I don't have a page number. I apologize. I'm just, uh, quoting from the, uh, from the language within the decision. Uh, after the discussion of trespass, where they indicate that it requires occupation of the property in a non-transient, continuous type of possession, uh, and they also indicate that there has to be specific intent to remain permanently or until ousted. They then discuss loitering. I was asking you because this is a, we were talking about loitering. And so that's why I'm asking you what language in Edgerly is apropos of our discussion of loitering. Right. And in that case, it said that loitering under California Penal Code section 647H also has a specific intent requirement for which the officers had no probable cause. That section requires that the alleged loiter or quote unquote, delay or linger on the property for the purpose of committing a crime as opportunity may be discovered. That's what the 911 caller was conveying to the police of when, when he called the police that there had been burglars in the area that these two people were there, he was concerned because they asked to use the cell phone. So why doesn't that meet the relatively low standard for probable cause? Well, when the caller made that, when the caller made his 911 call, he had encountered Mr. Pick and his partner out on the street near the sidewalk. And they said that they were in the shadows. But when the officers came to the location and they're sitting on the stairwell, they're not lurking. They're not peering into windows. They're just sitting there. And in fact, they're sitting there in a sort of an open and you know, on the stairwell, the lights are on them. They're not hiding from anybody. They're just sitting there. And again, we don't even know how long they were there. So for, for the, for there's two elements that weren't met here. We know that a period of time passed between the time of the 911 call and the arrival of the police and they were still there. Right. But then nobody had observed them on the property for longer than just a transient moment. And so therefore, a moment. Well, when the police came onto the, onto the property, they saw them and they immediately approached them. So at that point, they had no idea how long they had been there. They were, they were in the area when the 911 call was made because they were directed to that, to that apartment complex by the 911 caller. To the, to the immediate vicinity of that apartment complex. Not the fact that they were actually inside. Not the specific stairwell perhaps, but to that apartment complex. Well, they had indicated that they were at 11061, so Venice Boulevard. They were in that area. So, but they had reported that they had met them on the sidewalk. And so when the police initially got there, they started to go into the bushes and into the area near the sidewalk. They didn't even go into the complex because they were looking for them on the outside. They didn't expect to see them inside. And when they did see them, they saw them just for a moment before they just, before they approached them. And they were not hiding. They were not lurking. They were not doing anything suggestive of committing a burglary at that premises or, or, or a robbery or anything of that nature. So, therefore we would maintain that there was not probable cause for, for murder. You can see that your time. We'll give you a minute for rebuttal if needed. Thank you. Thank you. Good morning, your honors. Ryan Yang appearing on behalf of the United States. May it please the court. The court should affirm the denial of the motion to suppress because the district court did not air when it held that officers, Jonathan Yan and Rafael Ortega had reasonable suspicion to detain and frisk the defendants as conceded by the defendant in his reply brief. And today the court should also affirm because the search of the defendant was incident to arrest and because the officers would have inevitably discovered the stolen mail because the defendant has conceded that there was reasonable suspicion. I would like to, I would like to address the incident to arrest arguments. The same factors and circumstances that support reasonable suspicion similarly support probable cause that the defendants were trespassing or loitering. First, the officers were responding to a late night 911 call about two burglary suspects that were lurking in the shadows and who had approached the caller about using his cell phone. So all they really did was ask to whether they could use a cell phone. Is that enough to get probable cause? I know your honor. I, um, I do believe it goes to probable cause in the sense that the officers based on their training and experience, uh, know that opportunistic criminals, uh, have asked victims for their cell phones as employee to eventually rob them. Uh, I submit that there was reasonable suspicion to detain question and even to frisk the defendant. Um, but that reasonable suspicion developed and evolved into probable cause when the officers confirmed that there was no visible or lawful business or purpose for the defendants to be at the premise.  Ortega. Mr. Ortega was the one who said, I got friends living here and then like, no, not really. But, but Mr. Pick never said that. What's your response to that? The response was that based on the 911 call, which was not anonymous and had sufficient initial reliability, defendant and co-defendant were, um, at that night conduct or acting in together. Moreover, um, when the officers were questioning, uh, co-defendant Ortega and, um, the defendant, defendant, uh, explained to the officers that he was with co-defendant Ortega. And I would point to, um, that the district court found that co-defendant Ortega provided a series of inconsistent false statements. Essentially he lied. Uh, he told the officers first that he lived in an apartment. He even pointed at one of the, uh, apartment units. He then changed the story and said he didn't live there. In fact, he was visiting a friend. And then he changed the story once again and said, in fact, he was not visiting a friend that was, um, was just on the premise. Is Ortega's evasive response sufficient to generate probable cause regarding pick if that's, that's the point I understand opposing counsel to be making? Uh, I submit. Yes, it does. Because why is that? What's the case that supports that? I submit that it, um, that the false statements and the lies goes to, uh, consciousness and guilt, that they're false exculpatories. Uh, right. Right. That is correct. But your argument that by saying he was with Ortega, that pick adopted the statements that he made. He certainly didn't provide, uh, an explanation for why they were there. Um, and when the officers press officer Ortega about, I mean, uh, when the officers press co-defendant Ortega on why he had lied, he was unable to provide any explanation. I want to also briefly, uh, distinguish Edgerly, which was a civil rights case. Um, there the officers, um, only knew that the arrestee or the plaintiff did not live at the cooperative. They found, they saw him present during the day, uh, near the, uh, playground area, and they knew he didn't live there. This court held that there was no indication of, um, the arrestee harboring criminal intent. Uh, in fact, and also in footnote five, the court pointed out that, um, when judge Acuna stated earlier, his response of just chilling, um, it didn't, he didn't refuse to answer and he didn't give any indication, uh, that, uh, he was going to commit a crime as opportunity might be discovered. Counsel, as to, uh, Mr. Pick's statement, um, that it, uh, was his mail, uh, the government's position is that he did not move, um, to suppress that statement based on, uh, a failure to provide Miranda warnings. Is that right? That is correct, your honor. But he did move to just in general suppress everything, correct? He moved specifically on, uh, he did, the defendant did raise at the trial level, um, a Miranda issue, but as to statements made, uh, at the police station after he had been at Miranda's. So, um, uh, putting aside for a minute, the issue of having, uh, put this within the ambit of his conditional plea, why weren't Miranda warnings required at the time, um, he was questioned about the mail since the government's argument is that by that point there was probable cause and it certainly appears like a reasonable person in Mr. Pick's position would not have felt free to leave, um, uh, again, putting aside the issue of the, uh, the potential waiver. Um, why weren't Miranda warnings required before they questioned him about the mail? Uh, I, I believe, or I submit your honor that, um, Miranda would, um, only, um, come into play were it a custodial interrogation, uh, at that time. You're saying this is not a custodial interrogation at that point? Uh, at, I can see that, uh, the defendant and the co-defendant were handcuffed, uh, and they were, uh, had been escorted to the patrol car, but, um, this was not at a police station. This was not in a room. Um, the officers were not outnumbered. Um, and the defendants were not outnumbered by the officers. No weapons had been drawn. So the circumstances, uh, were not coercive. Um, and, uh, defendant was not formally in, uh, in custody. Um, I, I would also want to, uh, highlight... Do you, do you argue that the Miranda issue was waived? Yes, your honor. Um, I would also quickly like to point to People v. Garcia on the issue of trespass. I recognize, uh, the defendant's argument is that trespass is not, um, uh, there was no probable cause for trespass, but in, in Garcia, uh, the, it's, Garcia's very analogous to the case at hand. There it involved a citizen's arrest where, uh, the apartment manager saw the defendant looking into a window. It was late at night. The manager called out to the defendant who ran away from him. Uh, eventually the, the manager and the, uh, defendant met up again. The defendant provided inconsistent statements about visiting a friend. The apartment manager found, I mean, discovered, learned that the defendant had black gloves on. The California Court of Appeals held that, uh, under penal code section 602k, that, that was probable, there was probable cause for trespass. I recognize that the district court did not explicitly held on relating to trespass, um, but decided the issue on loitering, but I submit, uh, that there was probable cause for both trespass and, uh, loitering. I would also very quickly argue that this court could, in the alternative, affirm, um, on the grounds that, um, officer Gann, uh, in plain view saw, uh, the stolen mail. The defendant has already conceded. There wasn't any plain view until he took it out of Pick's, um, uh, belt, waistband. Yes. So we have to find that he was authorized to remove the, um, envelopes, which were not apparently a weapon. I don't think there's any argument that they felt like a weapon. No, Your Honor. I don't, the envelopes were tucked suspiciously in the back of the defendant's, uh, pads. But this court has held, um, in Thompson, um, that the removal of envelopes is not, uh, uh, is not unreasonable in conducting, uh, uh, a pat down. What, um, the court, this court, uh, found in Thompson that went beyond reasonableness was when, uh, the officers then rummaged or opened the envelope and then searched inside it. Here, on the face of the envelope, um, officer Gann realized that, um, they were made out to different addresses and different victims' names after the defendant had told him that the mail... How could you see that without rifling through them? I mean, I can see how you would see it on the top envelope, but how would you know that they were made out to other people unless you'd look through the package? In Thompson, the officer, in fact, opened the envelope and looked through it and then found stolen mail. In this case, the envelopes were not open, Your Honor. The names were... But he looked through the package of envelopes. Is, is, it wasn't clear in the, in the back. The record where officer Gann's testimony was from when they were at the patrol car, he had placed the, the mail on the car and saw that it was, um, made out to... So they were fanned out or something he could see them, rather than stacked up? How... Well, all of the mail were not, there was no mail that was made out to, um, David Silverman, which was the alias used. Our question was, how did the officer see it? If it was in a stack, they'd have to rifle through them. But if they were fanned out on the car... The record's not clear and I wouldn't want to misrepresent your point. Thank you, counsel. In that one minute, let's see if I can address some of these questions that you raised. Uh, first of all, as far as Edgerly is concerned, let's just talk about that drug trafficker to these police officers. So they, they already had, um, uh, historical information about him at the time they approached him. And so, uh, clearly they knew he didn't live there. Uh, his purpose, uh, could very well have been to sell narcotics at the cooperative, which would be sufficient for probable cause, one would think, to arrest him for loitering. And yet the court held that there was insufficient evidence of that, particularly because he had only been there for a very short period of time. They talked about it in terms of being a transient presence. In this case, the facts are even better. The presence is, is, is even, uh, for a shorter duration of time. We simply don't know how long they were on that, on that stairwell. They were not hiding anywhere. Uh, unlike the, uh, uh, trespass case that was mentioned. Um, there was no activity within the curtilage of the property suggests that they had any intention to enter any of the apartments or to commit any kind of crimes at the location. Now, quickly concerning, uh, the plain view, uh, uh, argument. We don't know exactly how these envelopes appeared, uh, when they were removed from the waistband, uh, at the back of Mr. Pick, uh, they could have been, uh, adhered together. Uh, but in any, in any event, there had to be some kind of a manipulation in order to look at the, at the, and discover the names of, uh, the addressees on these envelopes. Similar to the case in miles where you had this little box that was, was found on the, on that, on that, uh, individual. And then they shook the box and to hear what they thought might, might contain bullets or something of that nature. Uh, they had the right to, uh, do the pat down, but they didn't have the right to actually search the envelopes themselves. And for that reason, uh, there was no plain view. They weren't there. Just, they didn't just discover them inadvertently. Uh, officer Gannon instead examined them in, in, in examining them, he conducted a search. All right, counsel. You've exceeded your time. Thank you to both counsel for your arguments in this case. The case just argued is submitted for decision by the court. The next case on calendar for argument, United States versus Wallenstein.
judges: Rawlinson, Ikuta, Bennett